**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL McGUIRE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-10327 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| MICHAEL W. STURCH, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michael McGuire brings a claim against Defendant Michael W. Sturch under 42 U.S.C. § 1983 for violating his constitutional rights guaranteed by the Eighth and Fourteenth Amendments. Before the Court are Defendant's motion for summary judgment [41] and Plaintiff's motion for partial summary judgment on the issue of liability [45]. For the reasons set forth below, the Court grants Defendant's motion for summary judgment [41] and denies Plaintiff's motion for summary judgment [45]. The Court shall enter judgment in favor of Defendant and against Plaintiff. Finally, Plaintiff's motion for leave to file a sur-reply to Defendant's reply in support of his motion for summary judgment [64] is granted, as the Court considered the sur-reply in its resolution of the motions for summary judgment.

I. **Background**

The following facts are drawn primarily from the parties' Local Rule 56.1 statements of fact and the supporting exhibits appended thereto [43], [46], [51], and [54]. The following facts are undisputed unless otherwise noted. "When we cite as undisputed a statement of fact that a party has attempted to dispute, it reflects our determination that the evidence cited in the response does not show that the fact is in genuine dispute." *King v. Chapman*, 2013 WL 6709623, at *3

(N.D. Ill. Dec. 16, 2013). The Court has jurisdiction over Plaintiff's claim pursuant to 28 U.S.C. § 1343(a)(4). Venue is proper in this district pursuant to 28 U.S.C. 1391(b) because the events involved in the lawsuit occurred in this district.

In July 2015, Plaintiff was an inmate in the custody of the Illinois Department of Corrections ("IDOC") at the Dixon Correctional Center. [46, at ¶ 1.] He entered the IDOC in March 2013. [*Id.* at ¶ 2.] Because of the nature of his offense, Plaintiff is required to register with state authorities under 730 ILCS 150/3. [*Id.* at ¶ 3.] Defendant has been a parole agent employed by the IDOC since approximately 1990 and has served in the Sex Offender Supervision Unit for three years. [46, at ¶ 4]; [43, at ¶ 3]. Defendant's job duties include the supervision and monitoring of sex offenders, including placement investigations. [43, at ¶ 4.]

A.    **Denial of Plaintiff's request to serve his mandatory supervised release at the proposed host site**

Plaintiff became eligible for parole on July 29, 2015, subject to term of mandatory supervised release ("MSR" or "parole"). [46, at ¶ 7.] In order to be released on parole, the IDOC must approve the host site where an inmate will reside after his release. [43, at ¶ 6.] This "placement examination," is conducted by a parole agent who must determine, *inter alia*, whether the inmate's proposed host site satisfies the restrictions of 730 ILCS 5/11-9.3. [46, at ¶ 9]; [43, at ¶ 9]. The IDOC issues a Sex Offender Supervision Unit Protocol Manual (the "Manual") which provides procedures and guidelines for the supervision of sex offenders within the IDOC. [43, at ¶ 7.]

Among other things, the Manual outlines placement investigation procedures for MSR applications. [43, at ¶ 8.] With regard to the residency restrictions of offenders with child victims, such as Plaintiff, the Manual requests that agents "please follow the parameters as set forth in 730 ILCS 5/11-9.3." [43, at ¶ 9]; [43-4, at 8]. 730 ILCS 5/11-9.3 provides:

It is unlawful for a child sex offender to knowingly reside within 500 feet of a playground, child care institution, day care center, part day child care facility, day care home, group day care home, or a facility providing programs or services exclusively directed toward persons under 18 years of age. * * *

For the purposes of this Section, the 500 feet distance shall be measured from: (1) the edge of the property of the school building or the real property comprising the school that is closest to the edge of the property of the child sex offender's residence or where he or she is loitering, and (2) the edge of the property comprising the public park building or the real property comprising the public park, playground, child care institution, day care center, part day child care facility, or facility providing programs or services exclusively directed toward persons under 18 years of age, or a victim of the sex offense who is under 21 years of age, to the edge of the child sex offender's place of residence or place where he or she is loitering.

730 ILCS 5/11-9.3(b-10), 9.3(e). Consistent with the requirement of § 5/11-9.3, the Manual instructs parole agents to determine if there are any playgrounds, daycares, schools, or facilities providing programs exclusively for individuals under the age of eighteen within 500 feet of the residence. [43, at ¶ 10.] Parole agents must also ensure that the prospective host site is devoid of the following items: drugs, alcohol, and related paraphernalia; computers, routers, and internet related devices; pornography; weapons; and child related items. [43, at ¶ 11.]

In March 2015, Plaintiff completed a "Sex Offender Placement Investigation Form," stating that, if released, he would live at a proposed host site in Fox River Grove, Illinois. [46, at ¶ 11.] On, or around, April 2, 2015, Defendant's supervisor instructed him to conduct a placement investigation of Plaintiff's proposed host site. [43, at ¶ 13.] After determining that § 5/11-9.3 applied to Plaintiff, Defendant first consulted a DCFS map to determine whether there were any obvious playgrounds or child care centers in the area. [*Id.* at ¶¶ 14–15.] Defendant then drove to the proposed host site and observed that the Turner Camp of the Illinois Turner District was near the site. [*Id.* at ¶ 16.] When Defendant drove to the Turner Camp, he noticed signs for a summer camp and a swimming pool. [*Id.* at ¶ 17.] He also spoke to law enforcement officers from the

area who told him that the Turner Camp hosts many children's activities.[1]  [*Id.* at ¶ 18.]  In fact, the Turner Camp provides a "full program of physical education, swimming, organized games and handicraft, under the supervision of qualified instructors * * * throughout the summer season for all children living in private cottages with their parents."  [46, at 249 (Pl. Ex. 5, at 4).]  Believing that the Turner Camp therefore satisfied the requirements of 730 ILCS 5/11-9.3(b-10), Defendant proceeded to determine whether the proposed host site was within 500 feet of the Turner Camp. [46, at 21.]

Defendant knew that the 500-feet distance set out in § 5/11-9.3 required measurement from property line to property line.  [*Id.* at 22.]  Defendant testified that he determined where the Turner Camp property line was by "visually checking and checking with [MapPoint]."  [43-3, at 21:9–12, 24:11–13.]  He explained that, "it's not an exact scientific distance, but we do the best we can with what we have."  [43-3, at 21:12–14.]  He further testified that while he did not specifically remember what he did to determine the Turner Camp's property line [*id.* at 22:19–24:2], he remembered driving up a side road and then would have determined the camp's property line by looking at tree lines, fence lines, how the grass was mowed, *etc.* [*id.* at 22:11–18].  Defendant then demonstrated how he calculated the distance between the properties using the same equipment and programs that he would have used in 2015.  Defendant explained that after he had made a physical determination of where the property lines were, he would access the satellite maps feature of Bing Maps through MapPoint.  [*Id.* at 45:3–23.]  He would then use a feature in Bing Maps that allowed him to measure the exact distance between two points.  [*Id.* at 45:24–46:11.]  He demonstrated

---

[1] Plaintiff objects to this testimony as hearsay on the basis that it is being offered for the truth of the matter asserted.  Regardless, Defendant can testify to, and the Court may consider, the effect that those statements had on Defendant, which in this case was to cause him to conclude that the Turner Camp hosted many children's activities.  See, e.g., *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 430 (7th Cir. 2004) (noting admission at summary judgment of testimony that would otherwise be hearsay evidence if offered for the truth of the matter asserted is admissible if offered for the effect on the listener).

how he would have dragged a line from the edge of the proposed site's driveway to where he believed the edge of the camp's property was. [*Id.* at 46:12–47:7.]

In 2015, Defendant reported that the process outlined above had yielded a measurement of 478 feet.[2] [46, at 244 (Pl. Ex. 4).] Defendant recorded this measurement in Plaintiff's placement investigation file and completed Plaintiff's Sex Offender Placement form on April 15, 2015, marking "denied" on the form. [43, at ¶ 22]; [46, ¶ 34]. Defendant also reported his findings to his supervisor, Dave Blackburn, who approved Defendant's denial of the proposed host site in Fox River Grove on April 16, 2015. [*Id.* at ¶ 23.] Finally, on April 17, 2015, Elisa Williams, the Sex Offender Placement Coordinator, reviewed and approved the report. [*Id.* at ¶ 24.] Plaintiff received the report shortly thereafter. [*Id.* at ¶ 24.]

Plaintiff testified that his mother subsequently contacted the Illinois State Police and was allegedly informed that Plaintiff could have resided at the proposed host site in Fox River Grove. [43, at ¶ 26.] In light of that information, Plaintiff filed a grievance with the IDOC Administrative Review Board ("ARB"), but the grievance failed to mention the Fox River Grove address, or Defendant. [*Id.* at ¶ 27.] Plaintiff testified that his counselor helped him file grievances with both the ARB and the Illinois Prisoner Review Board in an effort to get the denial reviewed and the proposed site approved. [*Id.* at 30.] However, the Illinois Prisoner Review Board never overturned the decision, nor approved Plaintiff to serve his MSR outside the prison at any site because he was unable to provide any other residence where he could live if released. [46, at ¶¶ 36–37.] Plaintiff therefore remained in custody for one year after July 29, 2015, the day he became parole eligible. [46, at ¶¶ 7, 30.] After the IDOC released Plaintiff from custody in 2016, he registered with the

---

[2] Plaintiff's expert has submitted a report that determined the distance between the two properties is in fact 516.85 feet. [46, at 6 ¶ (7).] Thus, the two measurements differ by approximately 7.5%.

McHenry County Sheriff, using the site he had initially proposed to serve his MSR. [*Id.* at ¶ 39.] The McHenry County Sherriff approved that application. [*Id.* at ¶ 40.]

Plaintiff filed this suit on November 3, 2016. [1.] On August 9, 2017, Plaintiff filed his second amended complaint. [25.] That complaint asserted that Defendant's evaluation of whether Plaintiff could live at the proposed host site had violated Plaintiff's rights under the Eighth and Fourteenth Amendments to the Constitution of the United States. [25, at ¶ 26.] On June 4, 2018, the parties filed cross motions for summary judgment, see [41], [45]; which are now fully briefed. On September 13, 2018, Plaintiff moved for leave to file a sur-reply in response to Defendant's reply in support of his motion for summary judgment. [64.] The Court now resolves those motions.

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). Rule 56 makes clear that whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1). A party may also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. *Id.* In determining whether summary judgment is appropriate, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). But, a non-moving party "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture.'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th

Cir. 2017) (citation and quotation marks omitted). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 324.

It is not the role of the Court to scour the record in search of evidence to defeat a motion for summary judgment; instead, the nonmoving party bears the responsibility of identifying evidence to defeat summary judgment. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007). In other words, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Finally, as courts in this district have repeatedly noted, when, as here, parties have filed cross-motions for summary judgment, the analytical endeavor can be a Janus-like one that can require consideration of any legitimate factual disputes in the record as they bear on each movant's

respective summary judgment claims. See, e.g., *Northern Contracting Inc. v. State of Illinois*, 2004 WL 422704, *46 (N.D. Ill. March 3, 2004) ("In cases such as this involving cross-motions for summary judgment, 'the court must extend to each party the benefit of any factual doubt when considering the other's motion-a Janus-like perspective * * *.'") (quoting *Buttitta v. City of Chicago*, 803 F. Supp. 213, 217 (N.D. Ill. 1992)). The Court proceeds accordingly.

## III.    Analysis

Plaintiff asserts that Defendant engaged in an arbitrary and mistaken determination that he could not serve his parole at the proposed host site in violation of two provisions of the Constitution: (1) the Eighth Amendment's prohibition of cruel and unusual punishments, and (2) the Fourteenth Amendment's guarantee of substantive due process, specifically its prohibition of arbitrary action lacking any "reasonable justification in service of a legitimate governmental objective." *Christensen v. County of Boone*, 483 F.3d 452, 462 (7th Cir. 2007). Defendant counters that Plaintiff has not come forward with sufficient facts to show that he was deprived of either right, and that even he has, the claims are precluded by qualified immunity given the specific rights at issue were not clearly established.

To survive summary judgment on a claim brought under § 1983, a plaintiff must come forward with evidence that (1) "the conduct complained of was committed by a person acting under color of state law," and (2) that "this conduct deprived [him] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). Here, Defendant clearly acted under state law as he is (and at the relevant time was) employed by the IDOC and was following state law procedures when he made decisions about whether Plaintiff could serve his MSR at his proposed host site. Plaintiff must therefore establish that a reasonable trier of fact could find that he was deprived of his constitutional rights.

8

Additionally, because Defendant has raised the issue, Plaintiff also bears the burden of demonstrating that qualified immunity does not bar his claim. *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008) ("The plaintiff bears the burden of demonstrating the violation of a clearly established right.")

Qualified immunity shields government officials from civil liability "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In determining whether qualified immunity applies, a court "must address two questions: [1] whether the plaintiff's allegations make out a deprivation of a constitutional right, and [2] whether the right was clearly established at the time of defendant's alleged misconduct." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). Prior to its decision in *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court categorically required courts to conduct the two inquires sequentially in order to avoid stagnation in the development of constitutional law. See *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In *Pearson*, however, the Court receded from *Saucier* and explained that "district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 555 US. at 236. Nonetheless, the Court also noted that at times, such as here, it is sometimes best to adhere to the traditional two-step protocol. *Id.* The Court will therefore first examine whether Plaintiff has made out a constitutional violation, and then proceed to determine whether the particular right violated was clearly established. Before turning to those analyses however, the Court must address Defendant's argument that Plaintiff cannot proceed under both the Eighth and Fourteenth Amendments.

"Where a particular Amendment provides an explicit textual source of constitutional protection against a particular source of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing [those] claims." *County of Sacramento v. Lewis*, 523 U.S. 833, 841 (1998) (quoting plurality opinion in *Albright v. Oliver*, 510 U.S. 266, 273 (1994)). The Seventh Circuit has suggested that detaining an inmate past the expiration of his sentence or beyond his parole-release date implicates the Fourteenth Amendment's substantive due process considerations. See *Courtney v. Butler*, — F. App'x —, 2019 WL 718888, at *1 (7th Cir. Feb. 13, 2019); *Brown v. Randle*, 847 F.3d 861, 863–65 (7th Cir. 2017); *Werner v. Hall*, 836 F.3d 751, 760–61 (7th Cir. 2016). However, as *Courtney* acknowledged just last month, the Seventh Circuit has not conclusively determined whether an inmate's claims in such a circumstance are properly analyzed under the Eighth or Fourteenth Amendment. 2019 WL 718888, at *1 (reversing the district court's dismissal of a case and instructing the court on remand to determine "whether [plaintiff's] claims are more appropriately analyzed under the substantive due process clause or the Eighth Amendment").

Here, Plaintiff has affirmatively disclaimed any intent to proceed on a procedural due process claim under the Fourteenth Amendment. [55, at 10.] Thus, the only question is whether substantive due process under the Fourteenth Amendment is implicated. Given that the alleged wrong here did not result in the IDOC's failure to release Plaintiff, but instead resulted in him serving his MSR in prison rather than at his proposed host site, the Eighth Amendment's prohibition of cruel and unusual punishment provides "an explicit textual source of constitutional protection" from the wrong alleged here. In essence, Plaintiff was compelled to serve his parole in prison rather than at a place of his choosing outside the prison system. This could fairly be characterized as a form of cruel and unusual punishment, and not simply an imposition upon

Plaintiff's broader right to liberty. This characterization obviates the need to look to the Fourteenth Amendment's amorphous guarantees of substantive due process.

And, in any event, the Court could not conclude that the Defendant's actions were so widely arbitrary as to deprive Plaintiff of liberty without due process of law under the Fourteenth Amendment, given that Defendant's actions did not even amount to deliberate indifference.[3] Moreover, even if Defendant's actions were deliberately indifferent, as explained below, Defendant would qualify for qualified immunity because the rights Plaintiff seeks to vindicate were not clearly established at the time of his injury.

### A.    Step One — Constitutional Violation

Plaintiff asserts that Defendant's denial of his request to serve his parole outside prison violated the Eighth Amendment because he incorrectly and arbitrarily determined (1) that the Turner Camp qualified as "a facility providing programs or services exclusively directed toward persons under 18 years of age" under 730 ILCS 5/11-9.3(b-10) and (2) that the camp was less than 500 feet from the proposed host site. See generally [25]. As just explained, an inmate's continued detainment when he would otherwise be eligible for release or parole implicates the protections of the Eighth Amendment. See generally *Werner*, 836 F.3d at 760–61; *Armato v. Grounds*, 766 F.3d 713, 721–22 (7th Cir. 2014).

---

[3] Plaintiff is correct that the Court need not find that the Defendant's actions shocked the conscience given the Seventh Circuit has recognized inmates have a form of liberty interest in the determination of whether they may serve their MSR at home. See *Werner*, 836 F.3d at 760–61 (suggesting the Fourteenth Amendment's protections of liberty are implicated in failure to release cases); *T.E. v. Grindle*, 599 F.3d 583, 591 (7th Cir. 2010) (explaining that "[w]hen a state actor's deliberate indifference deprives someone of his or her protected liberty interest in bodily integrity, that actor violates the Constitution" and allowing a substantive due process claim to proceed). However, the Seventh Circuit's use of "deliberate indifference" in *Grindle* suggests that the analyses would be the same under either amendment, further confirming the Court's conclusion that only one analysis is needed. *Cf. Green-Fox v. Day*, No. 17-cv-3469, ECF. No. 49 (N.D. Ill. August 15, 2018) (declining to give both a Fourteenth Amendment and Fourth Amendment jury instruction given the two analyses collapsed into one). Thus, the Court need only measure Defendant's actions against the deliberate indifference standard.

That raises the most important issue in this case: determining the exact right implicated by Defendant's actions and thus Plaintiff's burden of proof. Unlike in *Armato*, *Werner*, and *Brown*, in which the plaintiffs alleged that the defendants' actions had directly led to their continued incarceration, Defendant's actions here caused Plaintiff to remain incarcerated only indirectly, though proximately. When Defendant denied Plaintiff's proposed host site after making critical determinations with allegedly deliberate indifference, the end result was Plaintiff's continued incarceration without penological purpose because Plaintiff actually could have served the MSR outside prison at that location. In response, Defendant argues that there is no Eighth Amendment violation here on the following basis: Plaintiff had to have an approved site, and no host site was ever certified, so Plaintiff's right to be released on MSR was not implicated. [42, at 5–6.]

That circular argument defies logic.[4] The Court acknowledges and agrees that "the federal judiciary has not clearly established that sex offenders who lack a lawful place to live must nonetheless be released from prison." *Brown v. Randle*, 847 F.3d 861, 864 (7th Cir. 2017). However, *Randle* strongly suggested, if not recognized, that there is right to be released if one does have a lawful place to live. *Id.* Thus, common sense dictates if an inmate has an Eighth Amendment right to be released on parole if he has a lawful place to live, he also has the right to have a location where he proposes to serve his parole evaluated according to the objective criteria the State has put forward and without deliberate indifference.

---

[4] Nor can Defendant attempt to "move the goal posts" by asserting that Plaintiff has not shown that he could have lived at his mother's house because he has not shown that at the time Defendant was conducting the site assessment, the proposed host site met the other conditions required for him to serve this parole there, namely the absence of certain items. [42, at 6–7.] Defendant rejected Plaintiff's proposed site because he determined that it was within 500 feet of the Turner Camp. If he did so with deliberate indifference, and not subject to qualified immunity, he is liable to Plaintiff. He cannot avoid liability by asserting after the fact that Plaintiff never met his burden of proving that the other conditions for parole were met, as inquiry into those conditions was pretermitted by Defendant's rejection based on the distance to the camp.

With the right at issue defined, the Court turns to Plaintiff's burden of proof. To survive summary judgment Plaintiff must prove that defendant evaluated his proposed host site with deliberate indifference, which resulted in his continued imprisonment beyond the term of his incarceration. See *Armato*, 766 F.3d at 721. To establish deliberate indifference, Plaintiff must show that Defendant acted with akin to criminal recklessness—*i.e.*, that Defendant ignored a known and excessive risk that his actions above would lead to the denial of Plaintiff's one possible MSR host site, and therefore his prolonged incarceration. *McGee v. Adams*, 721 F.3d 474, 480–81 (7th Cir. 2013). Thus, if Plaintiff can show there are no genuine issues of material fact that Defendant acted with criminal recklessness in the assessment of his proposed host site, he is entitled to summary judgment. Conversely, if there are no genuine issues of material fact and taking the facts in the light most favorable to Plaintiff still does not show that Defendant acted with akin to criminal recklessness, then Defendant is entitled to summary judgment.

1. **Defendant did not act with deliberate indifference in the determination that the Turner Camp implicates the "500-feet" rule of 730 ILCS 5/11-9.3**

As noted above, Plaintiff's first claim is that Defendant arbitrarily and wrongfully determined that the Turner Camp qualified as "a facility providing programs or services exclusively directed towards persons under 18 years of age" under state law. 730 ILCS 5/11-9.3(b-10). Plaintiff's interpretation of 730 ILCS 5/11-9.3(b-10), however, misreads the statute. "When interpreting statutes, first and foremost, we give words their plain meaning unless doing so would frustrate the overall purpose of the statutory scheme, lead to absurd results, or contravene clearly expressed legislative intent." *United States v. Vallery,* 437 F.3d 626, 630 (7th Cir. 2006). Here, § 5/11-9.3(b-10) states that a registered sex offender may not be within 500 feet of a "facility providing programs or services exclusively directed toward persons under 18 years of age." 730 ILCS 5/11-9.3(b-10). Plaintiff asserts that this means that if a facility has programs that caters to

both adults and children, it does not trigger the buffer zones of § 5/11-9.3.  See, e.g., [55, at 2 ("the statute does not cover a facility like the Turner Camp that provides programs for children and adults.")].  But, that is not what the statute says.  Plaintiff's understanding of the statute would require rewriting the statute to say "a facility *exclusively* providing programs or services *exclusively* directed towards persons under 18 years of age."  Because the Court cannot rewrite the statute, and must give the statute its plain meaning, if the Turner Camp provides *any* programs or services *exclusively to* children, then § 5/11-9.3 applies.

Although the parties dispute exactly what Defendant knew, when he knew it, and who if anyone gave him that information, the fact of the matter is that Plaintiff's Exhibit 5 states that the Turner Camp provides "[a] full program of physical education, swimming, organized games and handicraft, under the supervision or qualified instructors * * * daily throughout the summer season for all children living in private cottages with their parents."  [46, at 249.]  The Turner Camp therefore indisputably offers a program directed exclusively towards "persons under the age of 18."  The fact that the Turner Camp also offers activities to adults as well is immaterial, as is the fact that the children's programs appear to be seasonal.  Section 5/11-9.3 does not contain any kind of seasonal or temporal qualifications; thus, if a facility offers any activities or programs exclusively directed towards children, then a registered sex offender may not live within 500 feet of that location.  Plaintiff did not suffer a cognizable injury due to Defendant's deliberate indifference because Defendant correctly concluded that the Plaintiff could not live within 500 feet of the Turner Camp.  See, e.g., *Armato*, 766 F.3d at 720–21 (concluding that plaintiff did not suffer an injury because IDOC officials fully complied with an unambiguous, dispositive court order and released the defendant before the order required, despite the plaintiff's claim that he

14

could have been released earlier). Despite Plaintiff's contention otherwise, Defendant did not refuse to follow the guidance of the plain language of the statute; he properly followed it.

Defendant's deposition testimony suggesting that probation officers have "leeway" in determining whether or not locations qualify under § 5/11-9.3 is immaterial. [See 43-3, at 47:21–48:21.] Defendant certainly has not pointed to any source of law—statutory or regulatory—that confers any such leeway or latitude on parole agents when determining whether a location qualifies under § 5/11-9.3. Regardless of what the IDOC manual on which Defendant relied may suggest, the plain language of the statute states that if a location directs all its activities toward adults and children together, then § 5/11-9.3 does not apply. A location only triggers the 500 feet buffer zone of § 5/11-9.3 if it has programs directed solely towards children. However, the Turner Camp does have at least one program explicitly and solely directed towards children, so Defendant's erroneous belief that he "had leeway" in making the determination of whether Defendant could live within 500 feet of the camp is immaterial.

Nor does *People v. Haberkorn*, 100 N.E.3d 200 (Ill. App. Ct. 2018), countenance a different conclusion. In *Haberkorn*, the Illinois Appellate Court for the Third District overturned a defendant's conviction for violating 730 ILCS 5/11-9.3(c); specifically, for being "present on a school bus chartered by a facility providing programs or services exclusively directed towards persons under the age of 18." 100 N.E.3d at 202. As the court in *Haberkorn* explained, the majority of the services provided by the organization in question were directed toward adults, and the specific program at issue in that case was "a parent enrichment program offering support, training, and networking for parents, grandparents, and parents-to-be." *Id.* at 206. In fact, the specific program for which the bus had been chartered did not have *any* programs or services directed solely at children. *Id.* at 204. The defendant therefore could not have been convicted for

being at a venue "where children together with their parents congregate." *Id.* at 207. In other words, the state had failed to prove that the defendant was knowingly present at a facility providing programs or services exclusively directed toward children. [*Id.*] Here, the Turner Camp does offer a program directed exclusively to children; therefore, Plaintiff could have been convicted under the statute (or excluded from his proposed living site) under *Haberkorn*'s logic. Moreover, because *Haberkorn* was not decided until 2018, even if did reinterpret the statute to establish what Plaintiff claims it did, qualified immunity would still protect Defendant since the events at issue here occurred in 2015. See *Hurt v. Wise*, 880 F.3d 831, 840-41 (7th Cir. 2018) (noting a right must have been clearly established at the time of the alleged violation).

### 2. Defendant did not act with deliberate indifference in his determination that the Turner Camp was less than 500 feet from the proposed host site

Even if Plaintiff could not live within 500 feet of the Turner Camp pursuant to § 5/11-9.3, Plaintiff argues that the camp is more than 500 feet from the proposed host site and Defendant displayed deliberate indifference in determining otherwise. First, although it is not determinative, the Court assumes for the purposes of its resolution of the instant motions that the distance between the property line of Plaintiff's proposed home and the Turner Camp is 516.85 feet. [46, at 6 ¶ (7).][5] The question therefore is simply whether Defendant's determination that the distance was 478 feet—a difference of 38.85 feet or approximately 7.5%—was the result of deliberate indifference.

---

[5] Defendant disputes this fact arguing that Plaintiff's expert's determination of that distance relied upon "a distance measurement conducted in 2018, which lacks supporting evidence that the property lines have remained the same from the time the distance was measured in 2015 to present." [50, at ¶ 33.] Even if the Court were not obligated assume disputed facts in Plaintiff's favor and to consider the evidence in the light most favorable to him, Defendant must come forward with more than just metaphysical doubts about the truth of the assertion. Defendant must present at least some evidence that actually suggests that the property lines on the plat maps have changed.

As explained above, § 5/11-9.3(e) requires a parole officer to determine whether the distance between the "edge of the property comprising * * * [a] facility providing programs or services exclusively directed toward persons under 18 years of age* * *" and "the edge of the child sex offender's place of residence" is less than 500 feet. 730 ILCS 5/11-9.3(e). It is undisputed, therefore, that if at their closest point, the property lines of the Turner Camp and the proposed host site were more than 500 feet apart, Defendant could live at that residence. See [46, at ¶ 22].

In his deposition, Defendant testified that he determined the Turner Camp's property line by "visually checking and checking with [MapPoint]." [43-3, at 21:9–12.] More specifically, to determine whether Plaintiff's proposed released release site was within 500 feet of the Turner Camp, Defendant first drove around the neighborhood in an effort to identify the location of the property lines. [46, at 23.] He then used the "satellite view" and measuring tool within Bing maps—accessed through Microsoft MapPoint (the software available to him at the time)—to measure the distance between the end of the proposed host site's driveway to the point where he believed the Turner Camp's property began. [46, at ¶ 23]; [43-3, at 24:11–13]. He recorded that distance as 478 feet. [43-3, at 5–7.] Following that determination, Defendant rejected Plaintiff's application to live at the proposed host site because it was less than 500 feet from the Turner Camp. [43, at ¶¶ 22–24.]

As noted above, to survive summary judgment Plaintiff must show that Defendant ignored a known risk that his actions would lead to Plaintiff's continued incarceration. What that means in this context is not clear. Neither the parties, nor this Court's own research, have identified a similar case to determine whether Defendant's methodology in measuring the distance constitutes deliberate indifference. Instead, Plaintiff suggests the Court should look to the principles of indifference developed by Seventh Circuit to address deliberate indifference in the medical

context. Specifically, Plaintiff puts forward the Seventh Circuit's rule from *Petties v. Carter* that a plaintiff may demonstrate deliberate indifference by showing that the official's conduct was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." 836 F.3d 722, 729 (7th Cir. 2016). In other words, "an action that reflects sub-minimal competence" is deliberate indifference. *Id.*

Plaintiff asserts that Defendant's determination of the distance between the Turner Camp and his proposed host site constituted deliberate indifference because no other agent in his position would use such a methodology to determine if a sex offender could serve his MSR at that location. In support of that argument, Plaintiff submits the expert report of Daniel Block, Ph.D., a professor of Geography at Chicago State University. See generally [46, at 272–80.] Block asserts that Defendant's methodology of using tree-lines or fence lines to determine property lines was inappropriate because property lines do not always follow fence lines or tree lines and that in this case there were no obvious tree-lines or fence lines. [46, at 277.] Block further asserts that Defendant could have easily accessed an online "Geographic Information System" or "GIS" that would have quickly shown Defendant that his measurements were off and would have provided an exact distance between the property lines. [46, at 277–78.] In essence, Block asserts that Defendant not only committed "geographic malpractice," but that his departure from established "mapping norms" was so great "that it amounted to no measurement at all." [46, at 271–80.]

Plaintiff gets the right standard, but the wrong professional. The question here is whether any other probation agent would have calculated the distance in the same manner as Defendant, not whether a geography expert would. Plaintiff has not put forward any evidence to suggest that

Defendant's actions differed from what any other parole agent would have done.[6] Rather, he has put forward the report of a geography expert to assert that Defendant's actions were beyond reckless. The Court simply cannot agree with Block's ultimate conclusion that Defendant's measurement "amounted to no measurement at all." That assertion amounts to a legal conclusion regarding the ultimate question of fact at issue here: whether Defendant was deliberately indifferent, a conclusion of law which the Court need not and cannot accept. See, e.g., *Scottsdale Ins. Co. v. City of Waukegan*, 689 F. Supp. 2d 1018, 1024 (N.D. Ill. 2010) (striking conclusions of law from an expert's report). While the Court agrees that using the GIS system as Block used would have been the best practice, legions of cases establish that a failure to use best practices does not mean that Defendant's attempt to make measurements with the tools to which he had access constitutes deliberate indifference. *Cf. Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) (explaining that inmates are not entitled to "demand specific care" or "the best care possible"); *Johnson v. Santos*, 2018 WL 3216018, at *3 (S.D. Ill. Jan. 25, 2018) ("While best practices may have compelled Dr. Santos to follow up with Johnson the next day, the Eighth Amendment does not require such exacting care."); *English v. Smith*, 2008 WL 4287628, at *7 (N.D. Ill. Sept. 15, 2008) ("A prison official does not violate a prisoner's rights merely by failing to provide the best available procedures, however.").

To analogize to the medical field, Plaintiff's case against Defendant is akin to seeking to hold a medical technician liable for using a sonogram to investigate a health condition, when a doctor would have recommended using an MRI or PET scan to develop a clearer and more accurate picture. The Supreme Court and Seventh Circuit have routinely explained that disagreement over

---

[6] It is also important to note that neither Plaintiff nor Defendant has come forward with any document or previous precedent in which the State of Illinois, or an Illinois court, has provided guidance as to how parole officers should perform these measurements. Nor has this Court's own research located any such guidance.

the course of an inmate's medical treatment does not constitute deliberate indifference. See, e.g., *Estelle v. Gamble,* 429 U.S. 97, 107 (1976) ("But the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court * * *."); *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) ("What we have here is not deliberate indifference to a serious medical need, but a deliberate decision by a doctor to treat a medical need in a particular manner.")

As in *Snipes*, to the extent that Defendant's measurement techniques were "geographically erroneous," Plaintiff must show that the techniques disregarded an "excessive risk" that Plaintiff would be forced to serve his MSR in prison, rather than at an outside host location. See *id.* While perhaps Defendant should have examined the methods he used to determine distances in a case where the proposed site was so close to the limit, he was not deliberately indifferent to the risk of Plaintiff's continued incarceration without penological justification. Rather, Defendant made a deliberate decision to make his measurements in a certain way with the tools he had available. Perhaps if Defendant had simply used an "eyeballing" technique, his lack of effort and diligence would amount to deliberate indifference. But Defendant here made an inspection and used a mapping program to calculate a specific distance. And while Plaintiff's expert opines that Defendant's method disregarded "an excessive risk," the fact of the matter of is that Defendant's method produced a result that differed from Plaintiff's expert by only 7.7%.[7] The Court therefore

---

[7] A further complication is Defendant's awareness, or lack thereof, of the fact that this proposed host site was the only location at which Plaintiff could serve his MSR outside prison. In his report, Block suggests that Defendant's actions are particularly inexcusable given the high risk that an incorrect measurement would result in Plaintiff having to spend extra time in prison unnecessarily. See [46, at 274]. However, even if Defendant knew that the proposed site was a borderline case, he had no way of knowing that the Turner Camp area was the only location Defendant had to live outside prison. Plaintiff's point that

cannot conclude that Plaintiff has demonstrated that Defendant disregarded such an "excessive risk" to Plaintiff's release on MSR that he was deliberately indifferent.

Additionally, nowhere in the briefing does Plaintiff suggest that Defendant simply made up or changed his measurement to prevent the Plaintiff from living at this proposed site. Nor does the Defendant's previously mentioned testimony that he believed he had "leeway" to determine whether Defendant could live at the proposed site suggest in any way that Defendant fudged the measurement in an effort to prevent Defendant from living there. As noted above, Defendant's unchallenged testimony clearly shows that he made a good faith effort using a methodology that he could explain and demonstrate, and that he routinely used, to determine where the two property lines were, and then used an electronic measuring device to calculate the distance between them. The question before the Court is whether Defendant's actions, when construed as Plaintiff asserts, constituted deliberate indifference. For the reasons just explained, the Court cannot conclude that they did.[8]

### B.     Step Two — Clearly Established

Even assuming Plaintiff had proven that he could have legally lived at the proposed host site,[9] and that Defendant's measurement methods constituted deliberate indifference, Plaintiff's claim still founders upon the rocky shoals of qualified immunity given that the right at issue was not clearly established. A clearly established right is one that "is sufficiently clear that any

---

defendants must take plaintiffs as they find them is well taken, but at the same time, as explained more fully below, to escape qualified immunity, state officials must have been on notice of their Constitutional obligations. As explained below, the Court concludes Defendant did not have such notice.

[8]   That said, nothing in this opinion would prevent Plaintiff from bringing a state law wrongful imprisonment or negligence claim against Defendant in state court if such a claim is not time-barred.

[9]   It is undisputed that the McHenry County Sheriff allowed Plaintiff to live at the proposed host site after serving his MSR in prison.  [46, at ¶ 40.]

reasonable official would understand that his or her actions violate that right, meaning that existing precedent must have placed the statutory or constitutional question beyond debate." *Zimmerman v. Doran*, 807 F.3d 178, 182 (7th Cir. 2015) (citing *Mullenix v. Luna*, — U.S. —, 136 S. Ct. 305, 308 (2015)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The Supreme Court also has held that, in this context, legal rights cannot be defined at a high level of generality. *See, e.g., id.* ("The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken *in light of the specific context of the case, not as a broad general proposition*." (first emphasis in original) (citation omitted) (internal quotation marks omitted)).

In conducting the "clearly established" inquiry, the Court must first consider controlling Supreme Court and Seventh Circuit precedent. *Abbott v. Sangamon Ct*y., 705 F.3d 706, 731 (7th Cir. 2013). As the Seventh Circuit previously has noted, the absence of any precedent cited by the parties or located by this Court in its independent research demonstrates that this case is one of first impression. That does not end the inquiry. Instead, the Court must "cast a wider net" and look to whether "all relevant case law" demonstrates "such a clear trend * * * that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Abbott*, 705 F.3d at 731.

Plaintiff asserts that the right at issue here was clearly established no later than 2014 when *Armato* held that no prisoner may be held beyond the term of his incarceration without penological justification. 766 F.3d at 721. Plaintiff thus argues that Defendant can be held liable because he knew that, as a consequence of his conduct, Plaintiff would not be released to serve his MSR at the proposed host site near the Turner Camp. [55, at 13.] However, it was not until 2017 that the

Seventh Circuit even explicitly discussed the right of inmates who have lawful living plans to be released in *Randle*, 847 F.3d at 864.  And, in any event, the rights discussed in both *Armato* and *Randle* are extremely broad, and as the Supreme Court stated decades ago and reaffirmed as recently as 2017, "the clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, — U.S. —, 137 S. Ct. 548, 552 (2017) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  As explained above, the right at issue here is a corollary of the right to be released to a lawful residence noted in *Randle* and cannot be defined any more broadly than the right to have the location where an inmate proposes to serve his parole evaluated according to the objective criteria the state has put forward and without deliberate indifference.  However, in truth, the right Plaintiff seeks to vindicate is even narrower than that.  In essence, Plaintiff argues that Defendant had a constitutional obligation to evaluate his proposed host site under the criteria set out by his expert, using an online plat map and the automated tools provided by it.  That right cannot have been clearly established.  First, there is absolutely no precedent regarding a prisoner's rights in the context of an evaluation of whether he may serve his parole in a given location.  And *Randle*, from which the Court has derived Plaintiff's right to a proper determination of whether he could serve his MSR at a given location, was not decided until 2017.  But even at a level more generalized than that, the parties have not produced, nor this Court located, any Supreme Court or Seventh Circuit precedent regarding actions taken that indirectly led to a Plaintiff's continued incarceration.[10]

---

[10] The closest precedent the Court has been able to locate is an opinion from the Third Circuit which addressed whether a private psychologist engaged by a Parole Board to perform a psychological evaluation could be held liable under § 1983. *Williams v. Consovoy*, 453 F.3d 173, 175 (3d Cir. 2006).  In that case, the inmate alleged that the psychologist had reported false and misleading information intended to cause the Parole Board to deny the inmate's parole, the denial of which resulted in the inmate's false imprisonment and constituted deliberate indifference to his Eighth Amendment rights. *Id.* at 176.  The Court did not even reach the question of qualified immunity, however, because it concluded that the psychologist had absolute immunity because "by preparing his report at the Parole Board's request to assist in its decision-making"

Thus, given that the right from which the Court derived even the generalized right that Plaintiff alleged was violated here was not recognized until 2017, the Court cannot conclude that the right Plaintiff asserts was violated here was clearly established such that only a parole officer who was "plainly incompetent" or "knowingly violat[ing] the law" would have known that he could not have calculated the distance between two properties as Defendant did. The Court is also wary of requiring parole agents to act as if every proposed parole host site they evaluate must be treated as an inmate's only possible residence without any case having previously placed them on notice of that fact. Finally, while the Court is convinced that Plaintiff does not have the right to live within 500 feet of any facility that does not exclusively provide programs and services to those under 18, even if *Haberkorn* did establish that right, it was not established until 2018 when *Haberkorn* gave that reading of the statute. Consequently, the Court concludes that even if Plaintiff had proven that Defendant violated Plaintiff's constitutional rights, qualified immunity inoculates Defendant given those rights were not clearly established.

## IV. Sur-Reply

Three days after Defendant filed his closing brief in support of his motion for summary judgment, Plaintiff filed a motion for leave to file a sur-reply in response. [64.] Having reviewed the motion and the points sought to be addressed by the sur-reply, the Court grants Plaintiff's

---

the psychologist had acted as an arm of the court and was therefore entitled to absolute immunity. *Id.* at 178. This raises an important question—unaddressed by the parties—does the fact that Defendant, like the psychologist in *Williams*, prepared his report for the Illinois Prisoner Review Board, [46, at 35–36], entitle him to absolute immunity as a proxy for that board? See *Wilson v. Kelkhoff*, 86 F.3d 1438, 1444 (7th Cir. 1996) (noting that parole officers who are not parole board members are only entitled to absolute immunity "under circumstances where they perform acts with prosecutorial or judicial analogs.") The Seventh Circuit has repeatedly held that IPRB members are absolutely immune from suit for their decisions granting, denying, or revoking parole, *Walrath v. United States*, 35 F.3d 277, 282 (7th Cir. 1994), it has also extended that protection to "those activities that are part and parcel of the decision process," *Thompson v. Duke,* 882 F.2d 1180, 1184 (7th Cir. 1989).

motion. *Johnny Blastoff, Inc. v. L.A. Rams,* 188 F.3d 427, 439 (7th Cir. 1999) (leaving the approval of sur-replies to the district courts' discretion).

**V.     Conclusion**

For the reasons explained above, the Court grants Defendant's motion for summary judgment [41], denies Plaintiff's motion for summary judgment [45], and grants Plaintiff's motion for leave to file a sur-reply [64].   The Court shall enter judgment in favor of Defendant and against Plaintiff.


Dated: March 31, 2019

Robert M. Dow, Jr.
United States District Judge